BOCK v GENERAL MOTORS CORPORATION

Docket Nos. 215630, 216558. Submitted February 5, 2001, at Detroit. Decided July 20, 2001. Approved for publication October 16, 2001, at 9:00 A.M.

Evelyn R. Bock, as personal representative of the estate of George E. Bock, deceased, a former employee of General Motors Corporation (GM), and other present and former employees of GM brought an action in the Genesee Circuit Court against GM and Cincinnati Milacron (CM), also known as Cincinnati Milacron Marketing Company, seeking damages for injuries sustained during the course of employment when exposed to metal working fluids provided to GM by CM as bulk concentrate. The plaintiffs alleged that their exposure to excessive concentration levels of the fluids rose to the level of an intentional tort, thereby overcoming the exclusive remedy provision of the Worker's Disability Compensation Act, MCL 418.131(1). The court, Geoffrey L. Neithercut, J., denied the defendants' motions for summary disposition. The defendants appealed separately by leave granted. The appeals were consolidated.

The Court of Appeals *held*:

1. The court erred in denying summary disposition in favor of GM. That part of the court's order must be reversed. The facts as alleged by the plaintiffs, if true, demonstrate a reckless disregard by GM for the health, safety, and welfare of its employees. However, the plaintiffs failed to establish that injury was certain to occur and thus failed to show an intentional tort.

2. The court did not err in denying CM's motion for summary disposition that was based on the sophisticated user doctrine. That part of the court's order must be affirmed and the matter must be remanded for further proceedings. Although Court of Appeals precedent finding that commercial enterprises that use materials in bulk must be regarded as sophisticated users as a matter of law supports CM's contention that, pursuant to the sophisticated user doctrine, GM's bulk use of its products alleviates any duty to warn, there were questions of fact to be resolved with regard to the equally applicable proposition that a manufacturer's liability to a purchaser or a user of its product should be assessed with reference to whether its conduct, including the dissemination of infor-

mation about the product, was reasonable under the circumstances.

Affirmed in part, reversed in part, and remanded.

1. WORKER'S COMPENSATION — INTENTIONAL TORT EXCEPTION.

Neither the laws of probability and scientific proof addressing the odds or percentage of occurrences nor the conclusory statements of experts are sufficient to satisfy the certainty of injury requirement to show an intentional tort for purposes of the intentional tort exception to the exclusive remedy provision of the Worker's Disability Compensation Act (MCL 418.131[1]).

2. WORKER'S COMPENSATION — INTENTIONAL TORT EXCEPTION.

It is scientifically invalid to extrapolate observations or conclusions in animal experiments directly to human beings to determine human outcomes and such evidence is insufficient to satisfy the certainty of injury requirement to show an intentional tort for purposes of the intentional tort exception to the exclusive remedy provision of the Worker's Disability Compensation Act (MCL 418.131[1]).

3. PRODUCTS LIABILITY — NEGLIGENCE.

A manufacturer's liability to a purchaser or a user of its product should be assessed with reference to whether its conduct, including the dissemination of information about the product, was reasonable under the circumstances.

*Valdemar L. Washington, Sheila R. Thorp,* and *Dale E. Bock* and *Spence, Moriarity & Schuster, LLC* (by *Gerry L. Spence*), for the plaintiffs.

*Hardy, Lewis & Page, P.C.* (by *Terence V. Page* and *Joseph A. Starr*), and *Mayer, Brown & Platt* (by *John E. Muench* and *Robert M. Dow, Jr.*), for General Motors Corporation.

*Martin, Bacon & Martin, P.C.* (by *James N. Martin, Victor T. Van Camp,* and *Sean S. Cleland*), for Cincinnati Milacron.

Amicus Curiae:

*Clark Hill PLC* (by *Frederick R. Damm*), for Michigan Manufacturers Association.

Before: HOOD, P.J., and DOCTOROFF and K. F. KELLY, JJ.

PER CURIAM. Defendants appeal by leave granted from the trial court's orders denying their motions for summary disposition. We affirm in part, reverse in part, and remand for further proceedings.

Plaintiffs were employed by defendant General Motors Corporation (defendant GM) in its Flint engine plant.[1] This plant was approximately two million square feet in area and employed approximately three thousand individuals. The plant assembled V-8 engines, and various machining operations were performed on engine components. In the process of assembly, machining fluids were used to cool and lubricate, protect machines from corrosion, and wash away metal chips. The metal working fluids (MWF) were provided to defendant GM by defendant Cincinnati Milacron (defendant CM) as bulk concentrate.

Defendant CM did not retain the routine role of product supplier. Rather, in an attempt to improve its position in the competitive market, defendant CM created the "fluid management contract." This program was designed to respond to corporate manpower reductions and corporate "out-sourcing." Defendant CM's fluid management information bulletin set forth the various types of service packages available. The "fluid management contract" provided that defendant CM would participate as "team members or partners in dealing with process improvements, fluid controls, fluid selection, machine run-off, cost analysis, inven-

---

[1] Plaintiff Evelyn R. Bock is the personal representative of the estate of George E. Bock, deceased, a former GM employee who worked at the plant.

tory control, etc." In this type of service package, the "risk" would be shared with the client. The "fluid service contract" would involve the principle service of fluid control. Specifically, defendant CM would check chemical parameters, tank levels, inventory levels, and maintain records. The cost of this plan to the client would exceed the cost of materials depending on the amount of "checks" needed. Finally, the "customer designated" plan would be based on the individual client's needs and requests. Defendants agreed that services, in addition to product supply, would be provided by defendant CM.[2] Defendant CM provided onsite staffing at the Flint engine plant, supplied the necessary fluids for the plant, set the concentration levels of MWF, monitored the concentration levels in the plant, prepared two sets of material safety data sheets, and monitored the tank/piping system utilized by the fluids.

Despite the monitoring, the concentration levels of MWF exceeded the recommended use instructions of approximately four to six percent. In September 1993, an open valve allowed six thousand gallons of concentrate to spill into pit seven sometime between the evening of September 28 and the morning of September 29. The percent of concentrate in the fluid exceeded fifty percent, but was brought down to twenty-four percent by 4:00 P.M. Marc Rolf, a representative of defendant CM, testified that, after he discovered the high concentration, he advised defendant GM to remove the employees "working in it" because there was a risk of dermatitis.

---

[2] The exact terms of the relationship and the plan selected were not reduced to writing.

Despite their employment status with defendant GM, plaintiffs filed suit alleging that the incidents involving MWF exposure at excessive concentration levels by defendant GM rose to the level of an intentional tort. Plaintiffs alleged that they reported respiratory difficulties to defendant GM, but were provided no relief. Defendant GM allegedly knew of the harmful effects of the contents of the MWF in the 1980s. However, defendant GM did not make efforts to eliminate the risk or reduce the concentrations. Rather, plaintiffs alleged that defendant GM took measures to prohibit the discovery of the harmful effects by failing to post warnings, failing to maintain the material safety data sheets for employee inspection, and failing to allow employees to provide their own safety equipment. Plaintiffs further alleged that defendant GM took part in research studies regarding the effect of MWF, but took measures to skew the results, then discredit the study. Plaintiffs also alleged that defendant CM had a duty to warn employees of the effect of the MWF, but failed to do so. Defendant GM moved for summary disposition, alleging that plaintiffs' claims were barred by the exclusive remedy provisions of the worker's compensation statute. Defendant CM also moved for partial summary disposition, alleging that defendant GM was a sophisticated user, thereby relieving it of a duty to warn. The trial court concluded that there were issues of material fact and denied the dispositive motions. We granted defendants' applications for leave to appeal and consolidated the appeals.

Defendant GM first argues that the trial court erred in denying its motion for summary disposition. We agree. Questions regarding the exclusive remedy provision of the Michigan Worker's Disability Compensa-

tion Act (WDCA) are reviewed pursuant to MCR 2.116(C)(4) to determine whether the circuit court lacks subject-matter jurisdiction because the plaintiff's claim is barred by the provision. *Herbolsheimer v SMS Holding Co, Inc*, 239 Mich App 236, 240; 608 NW2d 487 (2000). Our review of the grant or denial of a motion for summary disposition is de novo. *Jones v Slick*, 242 Mich App 715, 718; 619 NW2d 733 (2000). When reviewing a motion under MCR 2.116(C)(4), this Court must determine whether the pleadings demonstrate that the defendant was entitled to judgment as a matter of law or whether the affidavits and other proofs show there was no genuine issue of material fact. *Id.*; MCR 2.116(I)(1).

The primary purpose of the worker's compensation act is to provide benefits to the victims of work-related injuries by allocating the burden of the payments to the employer and ultimately the consumer. *Eversman v Concrete Cutting & Breaking*, 463 Mich 86, 92; 614 NW2d 862 (2000). Regardless of fault, an employee who suffers an injury arising out of and in the course of employment is eligible for compensation. *Id.* Subsection 131(1) of the worker's compensation act, MCL 418.131(1), provides that employee compensation is the exclusive remedy for a personal injury, except for an injury resulting from an intentional tort. Consequently, the employer is immunized from tort liability with the exception of intentional torts. *Eversman, supra.* MCL 418.131(1) provides, in relevant part:

> The only exception to this exclusive remedy is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury.

An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge. The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall not enlarge or reduce rights under law.

In *Travis v Dreis & Krump Mfg Co*, 453 Mich 149, 173-174; 551 NW2d 132 (1996), the Supreme Court applied the rules of statutory construction and concluded that the Legislature intended that the plaintiff demonstrate that a supervisory or managerial employee had actual knowledge that an injury would follow from what an employer deliberately did or did not do. Additionally, the Supreme Court concluded that when an injury was "certain" to occur, there was "no doubt" with regard to whether it would occur. *Id.* at 174. Thus, laws of probability and scientific proof addressing the odds or percentage of occurrences, for example one out of ten individuals exposed to a risk, was insufficient to prove certainty. *Id.* Furthermore, conclusory statements by experts are insufficient to satisfy the certainty of injury requirement. *Gray v Morley (After Remand)*, 460 Mich 738, 742; 596 NW2d 922 (1999).

In *Agee v Ford Motor Co*, 208 Mich App 363, 364; 528 NW2d 768 (1995), the plaintiffs, former employees of the defendant, alleged damage as a result of exposure to asbestos during manufacturing processes at one of the defendant's plants. The plaintiffs' complaint alleged that the defendant had actual knowledge that an injury was certain to occur because asbestos dust and fibers were allowed to circulate throughout the plant. *Id.* at 366. Additionally, the complaint alleged that the defendant knew that expo-

sure would lead to certain injury to *at least some of its employees. Id.* To support this allegation, the plaintiffs submitted expert witness testimony that injury was certain to occur to approximately one-third of the employees at the plant as a result of the exposure. *Id.* This Court held that the plaintiffs' intentional tort allegation, that included consideration of the expert testimony, was insufficient to circumvent the exclusive remedy provision of the WDCA. *Id.*[3]

Likewise, in the present case, plaintiffs have failed to establish that injury was certain to occur. Plaintiffs' documentary evidence involving animal studies is insufficient to meet this high burden. It is scientifically invalid to extrapolate observations or conclusions in animal experiments directly to human beings to determine human outcomes. *Nelson v American Sterilizer Co (On Remand)*, 223 Mich App 485, 494; 566 NW2d 671 (1997). Additionally, plaintiffs' documentary evidence regarding studies of the effects of MWF and studies regarding other GM facilities failed to meet the high standard of MCL 418.131(1). See also *Gray, supra; Travis, supra.* We note that the facts as alleged by plaintiffs, if true, demonstrate a reckless disregard for the health, safety, and welfare of the employees, and we do not condone the conduct and omissions. However, the standard as set forth by the Legislature and as interpreted by the Supreme Court is not a gross negligence standard. Accordingly, the

---

[3] The parties' dispute regarding any dicta in *Agee* is irrelevant because our citation of dicta that we find persuasive is not prohibited. *Dykstra v Dep't of Transportation*, 208 Mich App 390, 392; 528 NW2d 754 (1995). In any event, the holdings of *Travis, supra,* and *Gray, supra,* established that the principles expressed in *Agee, supra,* are controlling, whether dicta or not.

trial court erred in denying defendant GM's motion for summary disposition.

Defendant CM argues that the trial court erred in denying its motion for summary disposition based on the sophisticated user doctrine. We disagree. In *Antcliff v State Employees Credit Union*, 414 Mich 624, 627; 327 NW2d 814 (1982), the plaintiff was injured when a powered scaffold on which he was standing unexpectedly gave way. The Supreme Court examined the relationship between the manufacturer, contractor, architect, and credit union before recognizing what is now know as the "sophisticated user" doctrine. The facts revealed that the manufacturer of the powered scaffold sold the product only to professional riggers. While the plaintiff's employer was trained regarding the powered scaffold, testimony revealed that, customarily, the scaffolding rigging technique was knowledge passed from a more experienced worker to a less experienced worker. Furthermore, the choice of suspension technique was a matter of personal preference. *Id.* at 632-633. As a result of the facts of the case, the Supreme Court concluded that the defendant manufacturer owed no duty to instruct, stating:

> There are countless skilled operations such as the rigging of scaffolding, which involve otherwise non-dangerous products in potentially dangerous situations. A manufacturer of such a product should be able to presume mastery of the basic operation. The more so when, as here, the manufacturer affirmatively and successfully limits the market of its product to professionals. In such a case, the manufacturer should not be burdened with the often difficult task of providing instructions on how to properly perform the basic operation. [*Id.* at 640.]

In the present case, defendant CM contends that pursuant to the sophisticated user doctrine defendant GM's bulk use of its products alleviates any duty to warn. Indeed, we held in *Aetna Casualty & Surety Co v Ralph Wilson Plastics Co*, 202 Mich App 540, 546; 509 NW2d 520 (1993), that "[c]ommercial enterprises that use materials in bulk must be regarded as sophisticated users, as a matter of law." However, equally applicable is the proposition that "[a] manufacturer's liability to a purchaser or a user of its product should be assessed with reference to whether its conduct, including the dissemination of information about the product, was reasonable under the circumstances." *Antcliff, supra* at 630.

In the present case, in an effort to increase profits, defendant CM changed the nature of its operation to provide for the supply of various fluids, but also agreed to include various service agreements. Defendant CM identified three different types of service arrangements, but never specifically identified the type of agreement reached with defendant GM. Additionally, defendant CM did not merely provide the fluids to defendant GM. Defendant CM provided on-site employees who measured concentration levels and mixed fluids. It is unclear, on the basis of the record provided, whether representatives of defendant CM caused the levels of concentration in excess of the recommended concentrations that were consistently measured. Furthermore, the extent of defendant CM's presence at the Flint plant was unknown. The exact number of employees placed at the Flint plant and the number of hours worked was unclear. Additionally, while defendant CM's representative testified that he was not allowed to provide warnings to defendant

GM's employees, the credibility of that statement and any attending motive presents an issue for the trier of fact. *SSC Associates Ltd Partnership v General Retirement System of Detroit*, 192 Mich App 360, 364-365; 480 NW2d 275 (1991). The measure of the standard of care is based on what a person of reasonable prudence would exercise under the circumstances as they existed. *Antcliff, supra* at 631-632. The trial court properly denied summary disposition in favor of defendant CM where the circumstances surrounding the relationship between defendant GM and defendant CM were not defined by contract, were unclear from the record provided, and were premised on credibility assessments.[4]

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

---

[4] Defendant CM's contention that the trial court erred in denying summary disposition of the claim of "intentional" failure to warn is without merit.